IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEBRA A. TERRY,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )   CASE NO. 1:12-CV-905-WKW
                                         )             [WO]
                                         )
LAUREL OAKS BEHAVIORAL                   )
HEALTH CENTER, INC.,                     )
                                         )
            Defendant.                   )

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff Debra A. Terry ("Terry") alleges that, during her employment, Defendant Laurel Oaks Behavioral Health Center, Inc. ("Laurel Oaks") subjected her to a sexually hostile work environment and retaliated against her for complaining about it, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e-17 ("Title VII").  Ms. Terry joins state-law claims for invasion of privacy, outrage, and negligent or wanton training, supervision, and retention.  Before the court is Laurel Oaks's motion for summary judgment (Doc. # 20), which is accompanied by a memorandum of law and evidence (Docs. # 21–22, 25).  Ms. Terry filed a memorandum of law and evidence in opposition to the motion (Doc. # 30), and Laurel Oaks submitted a reply (Doc. # 31).  After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Laurel Oaks's summary judgment

motion is due to be granted on Ms. Terry's Title VII claims alleging a sexually hostile work environment claim and retaliation, and that her state-law claims are due to be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, and 42 U.S.C. § 2000e-5(f)(3).  Personal jurisdiction and venue are not contested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a Rule 56 motion, the court views the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c)(1).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish – with

evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable factfinder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND[1]

### A. <u>Facts</u>

#### 1. *Laurel Oaks and Ms. Terry's Employment*

Ms. Terry worked for Laurel Oaks at its Dothan, Alabama location from 2004 until February 10, 2011. Laurel Oaks is a behavioral center, which offers acute psychiatric hospitalization and intensive residential treatment for adolescents with severe psychiatric disorders, mild or moderate mental impairments, substance abuse problems, and other high-risk behaviors.

Laurel Oaks has a psychiatric hospital, which is licensed by the Alabama State Board of Health and Department of Public Health and accredited by The Joint Commission. It also hosts a residential treatment center, which has three separate living units: Department of Youth Services ("DYS"), Female, and Male

---

[1] The facts are construed in the light most favorable to Ms. Terry. These summary judgment facts, therefore, "may not be the actual facts of the case." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (internal quotation marks and citation omitted).

A and B.  Each unit has its own living area and staff, including a lead therapist, a unit director, and mental health technicians ("MHTs").

Ms. Terry began working part-time with Laurel Oaks as an MHT in February 2004.  Around October 2004, Ms. Terry's status changed from a part-time to a full-time employee.  Ms. Terry primarily worked in the Female unit but occasionally worked in the other units based on staffing needs.  Laurel Oaks ran three shifts of MHTs; Ms. Terry usually worked the second or third shifts.  On or about March 25, 2010, Ms. Terry requested a transfer to the DYS unit.  She received her requested transfer as an assistant shift leader a few weeks later on April 7, 2010.  On the DYS unit, Ms. Terry's direct supervisor was a male, Velton Robinson ("Robinson").  Mr. Robinson was the unit director, and Ms. Terry alleges that a few months after her transfer, he began sexually harassing her.[2]

## 2.    *The Alleged Sexual Harassment*[3]

The alleged sexual harassment began in early July 2010 with two uninvited sexual propositions occurring within a five-day period.  On July 7, after Ms. Terry

---

[2]  Whether Mr. Robinson qualifies as a "supervisor" for purposes of analyzing a Title VII sexually hostile work environment claim is a disputed issue that is analyzed later in this opinion.

[3]  Mr. Robinson "completely den[ies] that [he] has[s] ever behaved in a sexually inappropriate or sexually suggestive manner toward [Ms. Terry]."  (Robinson's Decl. ¶ 12.)  However, at the summary judgment stage, the court cannot "weigh the evidence to determine the truth of the matter."  *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997).  Ms. Terry's version of the sexual harassment must be credited.

had finished working the second shift, Mr. Robinson, who was at home, called her on her cell phone.  He invited her to "swing by his house" and told her that her husband would never find out because she could tell him that she had to work the third shift.  (Pl.'s Feb. 1, 2011 Statement 1 (Ex. 26 to Pl.'s Dep.) (Doc. # 22-2).) Ms. Terry refused, saying that she was not that kind of woman, but Mr. Robinson persisted.  He asked again, promising that "it would not take long" and that "her perfume drove him crazy."  (Pl.'s Feb. 1, 2011 Statement 1.)   The second time he called her was five days later on July 12.  He told her that he wanted her to come by his house and pick up a cabbage to cook for him.[4]  Ms. Terry refused and told Mr. Robinson that he could bring the cabbage to her at work.  Mr. Robinson then revealed that the real intention of his call was not for her to come over to his house to pick up a cabbage, but that he wanted her to stop by because he had just "showered and had a . . . a few drinks."  (Pl.'s Feb. 1, 2011 Statement 3.)  She hung up on him, telling him not to call her any more "about this foolishness." (Pl.'s Feb. 1, 2011 Statement 3.)  But Mr. Robinson was undeterred by Ms. Terry's rejections.

Mr. Robinson extended a third proposition in mid-August, this time in person at the office, and the request was accompanied by unwanted physical

---

[4] Apparently, Ms. Terry had brought cooked cabbage to work on a prior occasion, and Mr. Robinson had liked it.

contact.  After directing her to a back room, Mr. Robinson wrapped his arm around her neck, while asking her why she would not come to his house as she "was driving him crazy" and he "want[ed] [her] so bad."  (Pl.'s Feb. 1, 2011 Statement 4.)  She rebuffed his advance orally and physically by knocking his arm away.  The encounter ended at that point because a patient came to the door, which Ms. Terry had left cracked open.

Three weeks later around September 7, Ms. Terry and Mr. Robinson were in the day room working on a shift report.  Mr. Robinson asked Ms. Terry to accompany him to his office under the pretense of getting supplies for patients.  Ms. Terry avoided Mr. Robinson until he left without her; however, when he returned, he accused her of playing hard to get and told her that he was going to keep trying until she "gave in" to him.  (Pl.'s Feb. 1, 2011 Statement 5.)  Nine days later on September 16, Mr. Robinson went out of his way to approach Ms. Terry, who he saw carrying a cake that she had made for a patient.  When he approached her, he looked at his genitals while remarking, "[Y]ou see what you do to me?"  (Pl.'s Feb. 1, 2011 Statement 5.)  He then said aloud that he better stop "doing this" because Ms. Terry might report him for sexual harassment.  (Pl.'s Feb. 1, 2011 Statement 6.)  Although there was then a two-month reprieve of crude comments, Mr. Robinson resumed in November, telling Ms. Terry, while she was

in the day room watching a movie with patients, that he "bet" she was "hotter than those hot potato chips" she was eating and asking her when she was going to finally "let [him] find out."  (Pl.'s Feb. 1, 2011 Statement 7.)  She ignored his comment at that time because patients were in the room, but later asked him to stop harassing her.

Ms. Terry also alleges that Mr. Robinson acted inappropriately toward her during daily staff meetings, which occurred between shift changes.  Beginning at some point prior to Mr. Robinson's first phone call to Ms. Terry on July 7, and continuing until October 14, 2010, Ms. Terry alleges that during these staff meetings, Mr. Robinson would sit next to her at the meeting's round table and would bump his knee and leg against her knee and leg under the table.  (Pl.'s Dep. 243–45.)  When she would ask him to stop, he would smile and laugh, but would not stop.  (Pl.'s Dep. 224.)  The knee/leg bumping occurred "several times a week."  (Pl.'s Dep. 314.)

Finally, on January 4, 2011, after an emergency staff meeting, Mr. Robinson asked Ms. Terry to sign some paperwork.  He told her, "I should have let you come to my office and sign it.  But you ain't going to act right.  I'm sick of you."  (Pl.'s Feb. 1, 2011 Statement 9.)

### 3.   *Laurel Oaks's Anti-Harassment Policy*

Laurel Oaks has an anti-harassment policy that prohibits "sexual harassment," including but not limited to "[s]exual flirtations, touching, advances, or propositions," "[v]erbal abuse of a sexual nature," "[g]raphic or suggestive comments about an individual's dress or body," and "[s]exually degrading words." (Employee Handbook 16 (Doc. # 22-2); Employee Conduct Policy (Doc. # 22-2).) Laurel Oaks's policy contains a procedure for reporting complaints of sexual harassment to management officials other than the employee's supervisor "where the supervisor's conduct is the object of the complaint."   (Employee Conduct Policy ¶ 5.)  Namely, the policy provides that, where the harasser is the supervisor, the employee should report the harassment to the onsite chief executive officer, the onsite human resources manager/designee, or the corporate human resources department.  (Employee Conduct Policy ¶ 5.)  The policy is published in Laurel Oaks's Employee Handbook and Employee Conduct Policy.  Ms. Terry does not dispute that during her employment, Laurel Oaks had in place a written anti-harassment policy.  (*See* Pl.'s Summ. J. Resp. 18 (Doc. # 30).)  Additionally, Laurel Oaks has in place a toll-free Values/Alert Line that employees may call anonymously to report any compliance issues.  (Human Resources Director Barbara White's Decl. ¶ 7.)

Laurel Oaks provided training on its policies, including the anti-harassment policy, to all new hires and annually to its employees. (*See, e.g.*, White's Decl. ¶ 5; Dykes's Dep. 11–12; Ingram's Dep. 67–68.) On April 28, 2009, and again on February 24, 2010, Ms. Terry signed Laurel Oaks's Employee Conduct Policy, which included the anti-harassment policy, acknowledging that she had received training on it and agreeing "to abide by it at all times." (Employee Conduct Policy (Exs. 20 & 22 to Pl.'s Dep. (Doc. # 22-2)); Pl's Dep. 127–29, 134–39.) Additionally, Ms. Terry does not refute Laurel Oaks's evidence that "[d]uring her employment with Laurel Oaks, [she] received these policies and trainings." (White's Decl. ¶ 5.) Ms. Terry also was aware during her employment that, if she believed that she was a victim of workplace sexual harassment, she was supposed to "[g]o to HR and make a complaint." (Pl.'s Dep. 75.)

### 4.   *Ms. Terry's Report of Mr. Robinson's Sexual Harassment*

On January 26, 2011, more than six months after the alleged sexual harassment commenced, Ms. Terry reported Mr. Robinson's sexually harassing behavior. She did so in conjunction with the receipt of an employee counseling form. On January 26, Mr. Robinson issued Ms. Terry an employee counseling form for insubordination for her alleged refusal to issue a write-up to a patient for misconduct. Mr. Robinson handwrote on the form, "Final Warning!!" and that

"continued problem[s] with this issue will lead to progressive discipline to include possible termination."  (Jan. 26, 2011 Employee Counseling Form (Doc. # 22-5).)

Although Ms. Terry disagreed with the charge of insubordination, she signed the counseling form based upon the following mandatory provision, which is printed on the form:  "As a condition of continued employment with Laurel Oaks Behavioral Health Center, sign below indicating receipt of this notification (signing does not imply agreement, but indicates that the above issue has been addressed with you)."[5]  (Doc. # 22-4; *see also* Doc. # 22-1, at 169 (Pl.'s Dep.).)  The form also contains a section labeled, "Employee Comments."  In this section, which continued in an attachment, Ms. Terry disputed that her conduct rose to the level of insubordination and also alleged that Mr. Robinson had "sexually harassed [her] on several occasions" and that he was "trying to get [her] fired" because he

---

[5] In 2009, Laurel Oaks implemented this policy requiring employees to sign counseling forms as a condition of continued employment.  The policy, which is included in Laurel Oaks's Employee Conduct Policy, provides in full that "[e]mployees must sign any counseling forms presented to them; signing does not imply agreement, but indicates that the issue was addressed with them.  Signing the counseling form is a condition of continued employment and is mandatory."  (Employee Conduct Policy, Ex. 2 to Dykes's Dep. (Doc. # 22-3).)  On April 28, 2009, and February 24, 2010, Ms. Terry signed the Employee Conduct Policy, indicating that she was aware of the policies set forth therein, which included the policy on signing counseling forms, understood those policies, and agreed to abide by their terms.  (Exs. 20 & 22 to Pl.'s Dep. (Doc. # 22-2); Pl.'s Dep. 134–35.)  Ms. Terry also signed the employee counseling form she received on October 18, 2010 based upon this mandatory policy.  (*See* Oct. 18, 2010 Employee Counseling Form (Doc. # 22-5).)

was "mad because [she] wo[uld]n't sleep with him."  (Jan. 26, 2011 Employee Counseling Form.)

Human Resources Director Terry Fiquett reviewed the counseling form, which included Ms. Terry's attached statement accusing Mr. Robinson of sexual harassment.  This was the first notice Mr. Fiquett had of the alleged sexual harassment, and the first time that Ms. Terry had voiced any sexual harassment concerns to a managerial employee who was authorized by Laurel Oaks's anti-harassment policy to receive such a complaint.[6]  At her deposition, Ms. Terry testified that she did not report Mr. Robinson's sexual harassment earlier because she "didn't trust" the human resources department because she believed that Laurel Oaks had fired employees in the past for "no reason."  (Pl.'s Dep. 232.)

### 5.   *The Investigation into Ms. Terry's Sexual Harassment Complaint*

Mr. Fiquett was in charge of the investigation into Ms. Terry's sexual harassment allegations against Mr. Robinson.  Initially, Mr. Fiquett informed Mr. Robinson that Ms. Terry had made a complaint of sexual harassment against him (but did not inform him of any of the "specifics"), told Mr. Robinson that an investigation was underway, and warned Mr. Robinson to "stay away" from Ms.

---

[6] Ms. Terry had once told a co-worker about Mr. Robinson's conduct, but prior to January 26, she had not reported the alleged sexual harassment to any management official designated by Laurel Oaks's anti-harassment policy to receive complaints of sexual harassment.

Terry. (Robinson's Dep. 94–95.) Between January 27 and 31, 2011, as part of his investigation, Mr. Fiquett conducted witness interviews and obtained written statements from three employees (the lead therapist in the DYS Unit and two of Ms. Terry's co-workers who also were MHTs). (Witness Statements (Ex. 3 to Ingram's Dep.).) Mr. Fiquett also asked Ms. Terry to provide a written statement concerning the incidents of the alleged sexual harassment. (Pl.'s Dep. 207–09, 269–70.) On February 1, 2011, as requested, Ms. Terry submitted a ten-page, handwritten statement detailing the incidents of alleged sexual harassment. (Pl.'s Feb. 1, 2011 Statement (Doc. # 22-2).) Mr. Robinson also was asked about the alleged sexual harassment, which he orally denied. (Robinson's Dep. 95–98.)

As a result of Ms. Terry's statement and in an effort to separate Mr. Robinson from Ms. Terry, Mr. Fiquett informed Ms. Terry that she was being transferred to the acute unit, effective either January 27 or 28. Ms. Terry did not "really want to go" to the acute unit because it was a "different unit" that housed "high-risk" patients. (Pl.'s Dep. 278.) Although Ms. Terry did not inform Mr. Fiquett of a specific reason for her objection to the transfer, she told him that she "didn't want to go over there, if [he] would let [her] go to the male unit." (Pl.'s Dep. 278.) Mr. Fiquett said that he was unaware of the availability of positions in

that unit.  (Pl.'s Dep. 278.)  Ultimately, Ms. Terry agreed "to go on to acute." (Pl.'s Dep. 278.)

After her transfer to the acute unit, on one occasion Ms. Terry saw Mr. Robinson, and he "winked" at her.  (Pl.'s Dep. 266.)  On a second occasion, Mr. Robinson saw her and "laughed," and she knew he was laughing at her because they were the only two in the hallway at that time.  (Pl.'s Dep. 267–68.)  Ms. Terry believes that these incidents – the wink and laughter – amounted to sexual harassment, but she offers no evidence or argument that she reported them.  (Pl.'s Dep. 266–69; Pl.'s Dep. 315 (admitting that she did not report these incidents).) Mr. Robinson engaged in no other alleged sexually inappropriate conduct toward her subsequent to her transfer to the acute unit.  (Pl.'s Dep. 268–69.)

Ultimately, as a result of his investigation, Mr. Fiquett concluded that Mr. Robinson had not acted in a sexually inappropriate manner toward Ms. Terry.  Mr. Fiquett informed Ms. Terry of the result of the investigation, but not its details. (Pl.'s Dep. 272.)

### 6.    *Ms. Terry's Termination*

On February 10, 2011, fifteen days after she had reported Mr. Robinson's alleged sexual harassment, Ms. Terry's employment ended when she refused to sign a counseling form based upon alleged misconduct arising from an incident

that occurred on January 24, 2011.  On January 24, while she still was working in the DYS unit, Ms. Terry called in a "Code R" because she needed assistance with patients acting out in the hall.  A Code R call requires MHTs within the area to respond immediately and assist with patient restraint.  Two MHTs, including David Hayes ("Hayes"), responded to the Code R, to assist in restraining a hostile patient.  In the course of trying to restrain the patient, Mr. Hayes suffered a cracked tooth.  This incident came to management's attention when Mr. Hayes filed an injury report on January 28.  During the investigation, the patient complained that Mr. Hayes improperly had restrained him, and Mr. Hayes reported that Ms. Terry was a witness.  As a result of the patient's complaint, Risk Management Director Tanjanika King reviewed the video footage and concluded that Ms. Terry had stood by and watched without intervening.  Ms. King recommended to Director of Nursing Jack Ingram that Ms. Terry receive a counseling form for her failure to intervene and assist in deescalating the situation, and Mr. Ingram agreed with the recommendation.[7]

The employee counseling form dated February 10, 2011, was prepared by Mr. Ingram as indicated on the "supervisor" line.  (Feb. 10, 2011 Employee

---

[7] As part of their job responsibilities, MHTs were expected to assist with patient restraining (or therapeutic holds) and intervene in any situation between patients to prevent their behavior from escalating.

Counseling Form (Doc. # 22-2).)   The form summarizes Ms. Terry's alleged violation as follows.   Ms. Terry called a Code R but did not "provide adequate assistance" to Mr. Hayes.   Rather, she stood by watching, while eating.   The form provides further that had Ms. Terry provided assistance, she "may have been able to prevent the injury" and that "eating on the unit while working is also prohibited."   The boxes checked on the counseling form indicate that the misconduct dealt with Ms. Terry's "Attitude/Cooperation," "Performance of Job Skills," "Staff Interaction," and "Interaction with Youth."   Additionally, the box labeled "Other" includes a handwritten notation for "failure to intervene."   (Feb. 10 Counseling Form.)

Mr. Ingram, accompanied by Mr. Fiquett and Human Resources Coordinator Maggie Dykes, presented Ms. Terry with the employee counseling form the same date.   Although asked to sign the form,[8] Ms. Terry refused because she felt that the allegations were "not true."   (Pl.'s Dep. 292.)   Mr. Ingram, Mr. Fiquett and/or Ms. Dykes persisted and "kept asking [Ms. Terry] to sign" the form, but she continued in her refusal.   (Pl.'s Dep. 292.)   As a result, either Mr. Fiquett or Mr. Ingram told Ms. Terry to turn in her keys, which she did, and both Mr. Fiquett and Mr. Ingram

---

[8] Ms. Terry does not remember who initially asked her to sign the form.   (Pl.'s Dep. 291–92.)

said, "You're terminated."[9]   (Pl.'s Dep. 292–93.)   The counseling form contains a notation that Ms. Terry "refused to sign."  (Feb. 10 Counseling Form.)

## B.   Procedural History

On October 16, 2012, after exhausting her administrative remedies with the Equal Employment Opportunity Commission, Ms. Terry commenced this action by filing a Complaint.   In the operative Amended Complaint (Doc. # 2), Ms. Terry brings Title VII claims against Laurel Oaks for a sexually hostile work environment and for retaliation.   The Amended Complaint also alleges violations of state law, namely, that Mr. Robinson invaded her privacy and Laurel Oaks ratified the same, that Laurel Oaks negligently or wantonly trained, supervised, and retained Mr. Robinson, and that Laurel Oaks and Mr. Robinson intentionally inflicted emotional distress upon Ms. Terry by subjecting her to sexual harassment and retaliation.

## IV.  DISCUSSION

Laurel Oaks moves for summary judgment on Ms. Terry's Title VII claims for a sexually hostile work environment and retaliation and on her claims brought under state law.   It also contends for the first time in this litigation that Ms. Terry

---

[9] Laurel Oaks contends that Ms. Terry's refusal to sign the counseling form amounted to a "voluntary separation," but at this stage, the court credits, as it must, Ms. Terry's testimony that Mr. Ingram and Mr. Fiquett expressly told her that she was fired.

must submit her claims to arbitration based upon an agreement executed between Ms. Terry and Laurel Oaks on March 28, 2006.  For the reasons that follow, Ms. Terry's Title VII claims cannot survive summary judgment, and the state-law claims are appropriate for discretionary dismissal pursuant to 28 U.S.C. § 1367(c)(3).  Finally, as will be explained, Laurel Oaks has waived any right to demand arbitration at this late date.

A.    **Title VII:  Sexually Hostile Work Environment**

Title VII prohibits an employer from maintaining a "sexually hostile work environment."  *Walton v. Johnson & Johnson Serv., Inc.*, 347 F.3d 1272, 1279 (11th Cir. 2003).  To establish a *prima facie* case of a hostile work environment, a plaintiff must demonstrate (1) that she belongs to a protected class, (2) she has been subjected to unwelcome sexual harassment, (3) the conduct must have been based on the sex of the employee, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) a basis for holding the employer liable.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).  "The fourth element . . . is the element that tests the mettle of most sexual harassment claims."  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582–83 (11th Cir. 2000), *abrogation on other grounds recognized by Crawford v. Carroll*, 529 F.3d

17

961 (11th Cir. 2008).   "Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere 'general civility code.'"  *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). For this reason, courts must "police the baseline" when they address hostile work environment claims at the summary judgment stage.  *Mendoza*, 195 F.3d at 1244.

The parties do not dispute that Ms. Terry, as a female, belongs to a protected class.  Laurel Oaks argues, however, that Ms. Terry has not demonstrated that Mr. Robinson's alleged harassing actions were "based on her gender" or that from an objective perspective, the harassment was severe or pervasive.  (Def.'s Summ. J. Mem. 29, 30.)  It contends, therefore, that Ms. Terry cannot satisfy the third and fourth *Mendoza* elements and presumably the second element since it is "intertwined" with the fourth.  *Johnson v. Booker T. Wash. Broad. Serv., Inc.*, 234 F.3d 501, 508–09 (11th Cir. 2000) (addressing the second and fourth prima facie elements together).   Furthermore, Laurel Oaks argues that, even if "all of the conduct at issue was based on [Ms. Terry's] gender and severe [or] pervasive," there is no basis to hold Laurel Oaks liable.  (Def.'s Summ. J. Mem. 26.)  The prima facie case will be addressed first, beginning with the second and the fourth elements.

1.     *Second and Fourth Elements*

The fourth element contains a subjective and an objective component.[10]  *See Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002).   The objective component requires that the harassment results in an "environment that a reasonable person would find hostile or abusive."  *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009).   When evaluating the objective component, all of the circumstances must be examined in their totality, including (1) the frequency of the discriminatory conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with an employee's work performance.  *Mendoza*, 195 F.3d at 1246.   An examination of these factors follows.

First, as to frequency, the alleged sexual harassment – which Ms. Terry endured over an approximate six-month time frame by her direct superior, *see supra* note 2  – included three unwanted invitations for a sexual rendezvous with Mr. Robinson at his home, a fourth invitation by way of a promise that he [Mr. Robinson] would not give up asking for sex until Ms. Terry gave in, a crude

---

[10] On the summary judgment record, the evidence is sufficient to demonstrate that Ms. Terry subjectively perceived that Mr. Robinson's sexual harassment rose to the level of severe or pervasive.  (*See generally* Pl.'s Feb. 1, 2011 Statement (explaining her feelings of loss of dignity).)  The present focus is on the objective component.

comment in Ms. Terry's presence that she had given him [Mr. Robinson] an erection, two sexually suggestive comments that she was driving him crazy, a comment that her perfume aroused him, a comment that he [Mr. Robinson] would invite her to his office to sign paperwork but he knew she would not "act right," and uninvited physical contact, including discrete under-the-table knee and leg bumping during staff meetings "several times a week" during a three-month period, and an arm around the neck in conjunction with one of Mr. Robinson's sexual invitations. While the hostile work environment analysis "is not, and by its nature cannot be, a mathematically precise test," *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993), Mr. Robinson's conduct fell within seven, separate incidents (occurring on July 7, July 12, August 12, September 7, September 16, November 24, and January 4), and included roughly twenty-four additional incidents of under-the-table knee and leg brushing (based on Ms. Terry's testimony that this occurred no less than twice a week for a twelve-week period). The frequency roughly parallels that in *Johnson*, where the Eleventh Circuit held that the alleged sexually harassing conduct "was not infrequent" based upon approximately "fifteen separate instances of harassment over the course of four months." 234 F.3d at 509. And the conduct here easily exceeds the frequency of that in *Mendoza*, where the alleged sexual harassment failed to hurdle the severe or pervasive threshold. *Cf.*

20

*Mendoza*, 195 F.3d at 1249 (holding that "a single instance of slight physical contact, one arguably inappropriate statement, and three instances of [the supervisor] making a sniffing sound" over a five-month period was not frequent).

Second, a reasonable jury could conclude that the conduct was severe.  Mr. Robinson made multiple propositions for sex, wrapped his arm around Ms. Terry's neck in conjunction with one of those propositions, used his authority to get Ms. Terry alone with him at work, and directed Ms. Terry's attention to his noticeably erect private parts.  Again, *Johnson* provides a rough parallel.  *See* 234 F.3d at 509 (Conduct was severe that included harasser's "giving [the plaintiff] unwanted massages, standing so close to [her] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts.").

Third, Mr. Robinson's behavior amounted to more than an offensive utterance.  A reasonable employee in Ms. Terry's position could find that his conduct was physically threatening and degrading on account of her sex, particularly given that the harassment came from Ms. Terry's direct superior.  *See Hulsey v. Pride Rest.*, 367 F.3d 1238, 1248 (11th Cir. 2004) (factoring supervisory status into the analysis of whether a reasonable employee would perceive the sexual harassment as "physically threatening and humiliating").

21

Fourth, a reasonable jury could find that Mr. Robinson's conduct interfered with Ms. Terry's job performance. Some of Mr. Robinson's conduct occurred at the workplace during the performance of her duties and required her either to rebuff his advances (both vocally and physically) or to try to avoid him when possible. He propositioned her at the office and promised to continue to do so and engaged in lewd behavior at the workplace. She also had to tolerate unwanted under-the-table knee and leg bumps, arguably intimate bumps (*see infra* Part IV–A–2), during at least twenty-four staff meetings. A reasonable jury could conclude that Mr. Robinson created a work environment where Ms. Terry was "fair game for uninviting touching, offensive propositions, and lewd comments." *Sears v. PHP of Ala., Inc.*, No. 05cv304, 2006 WL 932044, at *14 (M.D. Ala. Apr. 10, 2006).

In sum, the evidence, viewed in its totality and in the light most favorable to Ms. Terry, satisfies the summary judgment "baseline," *Mendoza*, 195 F.3d at 1244, so as to create a genuine issue of material fact as to whether the conduct of Mr. Robinson was sufficiently severe or pervasive to alter the terms or conditions of Ms. Terry's employment. Accordingly, Ms. Terry satisfies the second and fourth elements of her prima facie case.[11]

---

[11] As part of the second element, the sexual harassment also must be unwelcome. The summary judgment evidence, which includes Ms. Terry's testimony that she continually rebuffed Mr. Robinson's advances, satisfies this criterion, and Laurel Oaks does not contend otherwise.

## 2.   *Third Element*

Laurel Oaks says that Ms. Terry cannot prove that most of the conduct about which she complains is "based on gender." (Def.'s Summ. J. Mem. 30.) As an example, Laurel Oaks criticizes Ms. Terry's testimony about the leg brushes and knee-knocking as not sex-based. It relies on Mr. Robinson's testimony that because he is 6'5" tall, his knees always bump someone else's knees when there are six individuals seated at the small, round table during staff meetings. (Def.'s Summ. J. Mem. 30; Robinson's Decl. ¶ 12.) Laurel Oaks's argument omits mention of Ms. Terry's testimony that she requested Mr. Robinson to stop his under-the-table knee/leg-bumping and that he responded merely with laughter and a smile, but refused to stop (or even to move to another place at the table). A reasonable jury could conclude from this evidence, viewed in the light most favorable to Ms. Terry, that Mr. Robinson's touchings under the round table were intentional, and not merely the happenstance of his height, and that the touchings were an extension of his inappropriate sexual conduct toward Ms. Terry. Laurel Oaks does not make any specific argument that any other instance that factored

into the severe or pervasive inquiry above were unrelated to sex.[12]  Based on the

foregoing, Ms. Terry satisfies the second element of her prima facie case.

### 3.  *Fifth Element*

The issue turns to whether Laurel Oaks may be held responsible for Mr.

Robinson's creation of a sexually hostile work environment.  Title VII protects

employees from sexually hostile work environments created by supervisors and co-

workers.  The test for employer liability differs, however, depending upon whether

the harasser is a co-employee or a supervisor.  When the sexual harasser is a co-

worker, "an employer is directly liable for an employee's unlawful harassment if

the employer was negligent with respect to the offensive behavior."  *Vance v. Ball*

*State Univ.*, 133 S. Ct. 2434, 2441 (2013).  But where the sexual harasser is a

supervisor, "an employer may be *vicariously* liable for its employees' creation of a

hostile work environment."  *Id.*

In *Vance*, which resolved the lower courts' disagreement about the definition

of a supervisor for purposes of Title VII vicarious liability, the Court held that a

supervisor is one whom "the employer has empowered . . . to take tangible

employment action against the victim, *i.e.*, to effect a significant change in

---

[12] Other of Laurel Oaks's critiques focus on evidence that Laurel Oaks says is indicative only of "conflict[s] between the personalities on first shift . . . and second shift."  (Def.'s Summ. J. Mem. 31.)  Because the analysis above does not incorporate those incidents, it is unnecessary to address Laurel Oaks's argument in this regard.

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443 (citation and internal quotation marks omitted). If the harasser is empowered with responsibilities that qualify him or her as a supervisor, "the *Ellerth/Faragher* framework sets out two circumstances in which an employer may be vicariously liable for a supervisor's harassment."[13] *Id.* at 2448. "The first situation (which results in strict liability) exists when a supervisor actually takes a tangible employment action based on, for example, a subordinate's refusal to accede to sexual demands." *Id.* "The second situation (which results in vicarious liability if the employer cannot make out the requisite affirmative defense) is present when no such tangible action is taken." *Id.*

The *Ellerth/Faragher* affirmative defense requires proof "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807. For an employer to prevail on this defense, "'[b]oth elements must be satisfied," and the employer "'bears the burden of proof on both elements.'" *Bryant v. Sch. Bd. of Miami Dade*

---

[13] This affirmative defense arises from the companion cases of *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

*Cnty.*, 142 F. App'x 382, 385 (11th Cir. 2005) (quoting *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001)).

Here, essentially all of the issues surrounding the *Ellerth*/*Faragher* defense are in dispute.  The parties disagree whether Mr. Robinson is a supervisor and, if so, whether he took tangible employment action against Ms. Terry.  Furthermore, if the *Ellerth*/*Faragher* affirmative defense is available to Laurel Oaks, the parties dispute whether Laurel Oaks can demonstrate both parts.

### a.    Mr. Robinson's Status:  Supervisor or Co-worker

Laurel Oaks contends that there is no dispute that Mr. Robinson, notwithstanding his title as unit director, "could not hire, fire, fail to promote, [or] reassign significantly different responsibilities to or make decisions causing a significant change in benefits to employees."  (Def.'s Summ. J. Mem. 34 (citing Robinson's Dep. 40–41; White's Decl. ¶ 4; Robinson's Decl. ¶ 7;  Dykes's Decl. ¶ 7).)  Laurel Oaks asserts, therefore, that Mr. Robinson does not meet *Vance*'s definition of a Title VII supervisor.  While Laurel Oaks admits that Mr. Robinson issued a counseling form to Ms. Terry as a disciplinary action, it presents evidence that Mr. Robinson and all unit directors had to consult with the human resources department prior to taking disciplinary actions against an employee.  (Def.'s Summ. J. Mem. 34 (citing, among other evidence, White's Decl. 2 (declaring that a

26

unit director "can generally make recommendations about personnel issues," subject to an independent investigation and rejections or adoption by either the CEO or the Human Resources Director)).)  Ms. Terry says, on the other hand, that "[i]t is undisputed that [Ms.] Terry was harassed by her supervisor" (Pl.'s Summ. J. Resp. 15), but her analysis is sparse.  It cannot be undisputed, however, that Mr. Robinson both was Ms. Terry's Title VII supervisor *and* her co-worker.

The declarations and deposition testimony upon which Laurel Oaks relies support its position concerning what it says Mr. Robinson did and did not have authority to do with respect to employee supervision.  Notably, Laurel Oaks omits any reference to or explanation of the Position Description of a DYS Unit Director, which Mr. Robinson signed on January 28, 2010.  (Pl.'s Ex. 1 to Robinson's Dep.) That position description includes in the enumeration of a unit director's duties that he or she will "conduct interviews, hire, terminate and coordinate corrective action processes."  (Pl.'s Ex. 1 to Robinson's Dep.); *see generally Vance*, 133 S. Ct. at 2449 (recognizing the plaintiff-victim's reliance on the harasser's job description to establish supervisor liability).  The position description contradicts Laurel Oaks's evidence that unit directors have no authority in personnel matters "such as hiring [and] firing."  (*See, e.g.*, White's Decl. ¶ 4.)  It is sufficient evidence to create a genuine dispute of material fact as to whether Mr. Robinson qualifies as a

Title VII supervisor.  The analysis of the *Ellerth*/*Faragher* defense, therefore, will assume Mr. Robinson's supervisory status.

### b.   The *Ellerth*/*Faragher* Defense

### i.   Tangible Employment Action

The availability of the *Ellerth*/*Faragher* defense depends upon whether Mr. Robinson, as Ms. Terry's supervisor, actually took a tangible employment action against Ms. Terry.   Ms. Terry asserts that Mr. Robinson took two tangible employment actions against her with respect to two employee counseling forms she received.  The first alleged tangible employment action occurred on October 18, 2010, when Ms. Terry received an employee counseling form from her unit director at the time, who was not Mr. Robinson, but rather Cedric Peterson. Although Mr. Peterson is noted on the counseling form as Ms. Terry's supervisor and Mr. Robinson's name appears nowhere on that form, Ms. Terry testified at her deposition that Mr. Peterson told her that Mr. Robinson directed him to issue the counseling form based upon Ms. Terry's alleged failure to perform a proper patient bed count.  (Pl.'s Summ. J. Resp. 16 (citing Pl.'s Dep. 152, 154).)  Laurel Oaks argues that Ms. Terry's testimony amounts to "inadmissible hearsay."   (Def.'s Summ. J. Reply Br. 4 n.1.)

"[I]nadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation and internal footnote omitted).[14]   The out-of-court statement presents two potential hearsay layers.  Ms. Terry, the deponent, has testified that Mr. Peterson told her (first layer) that Mr. Robinson told him (second layer) to write up Ms. Terry.  Ms. Terry does not adequately address the potential hearsay problem in her summary judgment briefing.  In fact, she does not mention it at all.  There are twenty-nine exceptions to the hearsay rule, *see* Fed. R. Evid. 803–04, and several types of statements that are not considered hearsay at all, *see* Fed. R. Evid. 801(d)(1)–(2), and Ms. Terry essentially has left it to the court to figure out if any subsection is applicable.  But Ms. Terry, not the court, must oppose the summary judgment motion.  While conceivably an argument could be made for the applicability of Rule 801(d)(2)(D),[15] "[i]t is well established that Rule 801(d)(2)(D) requires the *proffering* party to lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment."   *Wilkinson v.*

---

[14] Federal Rule of Civil Procedure 56(c)(4) provides that "an affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge [and] set out facts that would be admissible in evidence."  In *Macuba*, the Eleventh Circuit held that this procedural rule "also applies to testimony given on deposition."  193 F.2d at 1323.  Thus, an out-of-court statement made to a deponent is "admissible in evidence" only if it is "admissible at trial for some purpose."  *Id.*

[15] *See* Fed. R. Evid. 801(d)(2)(D) (excluding from the definition of hearsay any statement "offered against an opposing party" that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed").

*Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1566 (11th Cir. 1991).  As the proffering party of this statement, Ms. Terry has not attempted to lay a predicate for its admissibility under Rule 801(d)(2)(D) (or any other rule for that matter). She cites no evidence, for example, that Mr. Robinson's directive to another unit director to take disciplinary action against an employee who is not under his supervision "relates to a matter within the scope of [Mr. Robinson's] employment."  *Wilkinson*, 920 F.2d at 1566.  Accordingly, Ms. Terry has not met her burden of demonstrating the admissibility of the statement.  It is unnecessary, therefore, to decide whether the October 28, 2010 counseling form amounts to a tangible employment action because there is no admissible evidence tying it to Mr. Robinson.[16]

The second alleged tangible employment action occurred on January 26, 2011, when Mr. Robinson issued Ms. Terry a counseling form for failing to follow his "instruction on 1/20/11" to document an incident concerning "patient care." (Jan. 26, 2011 Counseling Form (Pl.'s Ex. 6 to Robinson's Dep.).)  Ms. Terry relies on the timing of the January 26 counseling form – namely, its temporal

---

[16] Alternatively, however, the court finds for the same reasons that the January 26, 2011 counseling form (discussed next) is not a tangible employment action that the October 28, 2010 counseling form also is not.  In short, Ms. Terry presents no evidence that the October 28, 2010 counseling form resulted in any direct economic harm to her.

proximity to Ms. Terry's repeated rebuffing of Mr. Robinson's advances – and on the form's warning.   Mr. Robinson wrote "Final Warning!!" on the form and further provided that "continued problem[s] with this issue will lead to progressive discipline to include possible termination." (Jan. 26, 2011 Counseling Form.) Ms. Terry argues that she believed that this counseling form "create[d] a clear path to termination for any offense that allegedly comes next." (Pl.'s Summ. J. Resp. 17.) Laurel Oaks responds that Ms. Terry's belief is not reasonable given that almost four years earlier Ms. Terry had received a "final warning" on a counseling form for a different offense, but had remained employed even though she thereafter received additional counseling forms. (Def.'s Reply Br. 4 n.1 (Doc. # 31).)

A tangible employment action is a "[s]ignificant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 133 S. Ct. at 2442.   The Supreme Court contemplates that a tangible employment action generally will have a "direct economic harm" on the employee. *Vance*, 133 S. Ct. at 2448; *Ellerth*, 524 U.S. at 762 ("A tangible employment action in most cases inflicts direct economic harm.").   In *Davis v. Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001), the Eleventh Circuit observed that "courts are wisely reluctant to treat job performance memoranda as actionable under Title

VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." *Id.* at 1241 (collecting cases). "An employee who receives criticism or a negative evaluation may lose self-esteem and conceivably may suffer a loss of prestige in the eyes of others who come to be aware of the evaluation. But the protections of Title VII simply do not extend to everything that makes an employee unhappy." *Id.* (citation and internal quotation marks omitted).

The January 26 counseling form falls short as a matter of law of qualifying as a tangible employment action under prevailing law. There is no evidence that the form had any negative effect on Ms. Terry's job duties or resulted in any significant change of benefits. Ms. Terry does not argue or present any evidence, for example, that she was denied a pay increase or suffered a decrease in pay or that the form otherwise had any negative impact on her compensation. Based on the summary judgment record, the January 26 counseling form inflicted no direct economic harm on Ms. Terry.

Moreover, although Ms. Terry complains that the counseling form made termination more of a possibility than it would have been without the "final warning" with respect to the consequences of future misconduct, there is no dispute that the form itself was not a termination. Nor has Ms. Terry presented any

evidence that the "final warning" impacted the then-current terms or conditions of her employment or promotional opportunities.   The form, although it bears negatively on Ms. Terry's job performance, does not trigger any tangible economic action so as to qualify as a tangible employment action.[17]   Because Ms. Terry has not shown that Mr. Robinson took a tangible employment action against her, Laurel Oaks may invoke the *Ellerth*/*Faragher* defense.

###### ii.   Reasonable Care to Prevent and Correct Sexual Harassment

The first element of the *Ellerth*/*Faragher* defense requires proof "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior."   *Faragher*, 524 U.S. at 807.   The analysis turns first to the prevention prong, followed by discussion of the correction prong.

"The Supreme Court [in *Faragher*] implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1297–98 (11th Cir. 2000) (citing *Faragher*, 524 U.S. at 807).   But to do so, the employer must show "that its sexual harassment policy was effectively published, that it contained reasonable

---

[17] Ms. Terry's claim that her termination was retaliatory, a separate Title VII claim, is analyzed in Part B.

complaint procedures, and that it contained no other fatal defect." *Frederick*, 246 F.3d at 1314; *see, e.g., Faragher*, 524 U.S. at 808 (denying an employer the affirmative defense because, although it had a sexual harassment policy, it had "entirely failed to disseminate [that] policy").

Ms. Terry does not dispute that during her employment, Laurel Oaks had in place a written policy that prohibited sexual harassment in the workplace of the very kind about which she complains.[18]   The evidence also establishes that Ms. Terry knew about the policy from the beginning of her employment and well before the onset of Mr. Robinson's alleged sexual harassment, and that she received annual training on the policy.  (Employee Handbook; Employee Conduct Policy; White's Decl ¶ 5; Pl.'s Dep. 127–29.)  Ms. Terry also was aware that, if during her employment she believed that she was the victim of sexual harassment, she was supposed to "[g]o to HR and make a complaint."  (Pl.'s Dep. 75.)  Based upon the summary judgment record, there is no genuine dispute of material fact that Laurel Oaks effectively published its anti-harassment policy.

---

[18]  The policy expressly covered the acts Mr. Robinson allegedly committed, as it prohibited "sexual harassment," including but not limited to "[s]exual flirtations, touching, advances, or propositions," "[v]erbal abuse of a sexual nature," "[g]raphic or suggestive comments about an individual's dress or body," and "[s]exually degrading words."  (Employee Conduct Policy 15.)

The policy also contains a procedure for reporting complaints of sexual harassment. In *Walton*, the Eleventh Circuit held that the employer exercised reasonable care to prevent harassment where its "anti-harassment policy provide[d] an alternative channel for making complaints other than to the harassing supervisor." 347 F.3d at 1287. As in *Walton*, Laurel Oaks's procedure includes an alternative reporting mechanism "where the supervisor's conduct is the object of the complaint."[19] (Employee Conduct Policy.) Namely, where the harasser is the supervisor, the policy provides that the employee should report the harassment to the onsite chief executive officer ("CEO"), the onsite human resources manager, or the corporate human resources department. (Employee Conduct Policy 16 ¶ 5.) Ms. Terry has not argued or presented evidence that she did not have ready access to the CEO or the human resources department (both local and corporate) for purposes of bringing a complaint.[20] Based upon the summary judgment record and *Walton*, there is no genuine dispute of material fact that Laurel Oaks's anti-harassment policy had reasonable complaint procedures.

---

[19]   Although not part of the anti-harassment policy itself, employees at Laurel Oaks also have available a toll-free Values/Alert Line to report any compliance issues anonymously. (White Decl. ¶ 7.) This toll-free number provides an additional measure for the prevention of harassment in the workplace.

[20] Laurel Oaks cites evidence, which Ms. Terry does not refute, that the CEO's office and the human resources department are in the administration building near where Ms. Terry punched her time clock and that employees "have regularly had access to the CEO and Human Resources Director." (King's Decl. ¶ 4.)

Although Ms. Terry argues in perfunctory fashion that the anti-harassment policy was "defective" (Pl.'s Summ. J. Resp. 19), she stops short of identifying any defect or citing any evidence suggesting a fatal defect in the policy.[21]  It is not the court's responsibility to sift through the summary judgment submissions in search of evidence to support Ms. Terry's argument.  (*See* Uniform Scheduling Order § 2 (Doc. # 14)); *see also Dickson v. Amoco Performance Prod., Inc.*, 845 F. Supp. 1565, 1570 (N.D. Ga. 1994) ("It should be a party's responsibility to direct the Court's attention separately to each portion of the record which supports each of the party's distinct arguments.").   Accordingly, Ms. Terry has not submitted evidence from which it can be inferred that the Laurel Oaks's anti-harassment policy contained a fatal defect.

In sum, the undisputed evidence establishes that during Ms. Terry's employment, Laurel Oaks had an established, written anti-harassment policy that

---

[21]  In a different section of her summary judgment response, Ms. Terry assumes that Laurel Oaks did not properly train Mr. Robinson on the anti-harassment policy because she says that if it had, she "would not have been sexually harassed."  (Pl.'s Summ. J. Resp. 29–30 (Doc. # 30).)  It is true that there is authority that the absence of supervisory training on an employer's anti-harassment policy is relevant on the issue of a policy's effectiveness.  *See Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1990).  However, Ms. Terry again cites no evidence to back up her assertion or refute Laurel Oaks's evidence that its supervisory employees, including Mr. Robinson, received regular training and reminders of its policies, including the anti-harassment policy, and that its supervisory employees understood that they were bound by the anti-harassment policy.  (*See, e.g.*, Robinson's Decl. ¶¶ 2–3; King's Decl. ¶ 2; White's Decl. ¶ 2.)  Ms. Terry's contrary assumption is nothing more than speculation.  *See Avenue CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (A plaintiff cannot overcome summary judgment based upon "speculation and conjecture.").

provided alternative means for an employee to raise a complaint, including a means that did not require Ms. Terry to report the sexual harassment to Mr. Robinson, that Laurel Oaks published and provided training on its anti-harassment policy, that Ms. Terry knew of and received training on the policy, and that Ms. Terry knew how to invoke its grievance mechanisms.  Accordingly, Laurel Oaks has demonstrated that there is no genuine dispute of material fact that it exercised reasonable care to prevent sexual harassment by promulgating and publishing an anti-harassment policy with reasonable complaint procedures and with no fatal defects.

The next issue is whether Laurel Oaks has demonstrated that there is no genuine dispute of material fact that it took reasonable care to correct promptly Mr. Robinson's offending conduct.  It has.

As to this component of the *Ellerth*/*Faragher* defense, "an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint."   *Frederick*, 246 F.3d at 1314.   Concerning the adequacy of the employer's response, the Eleventh Circuit has explained:

> A threshold step in correcting harassment is to determine if any occurred, and that requires an investigation that is reasonable given the circumstances.  The requirement of a reasonable investigation does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser.  Nothing in the *Faragher-Ellerth* defense puts

a thumb on either side of the scale in a he-said, she-said situation. The employer is not required to credit the statements on the she-said side absent circumstances indicating that it would be unreasonable not to do so.

*Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303–04 (11th Cir. 2007).   Moreover, an employer's remedial measures are deemed reasonable when they "stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur."   *Walton*, 347 F.3d at 1288 (citation and internal quotation marks omitted).

The investigation began no later than the day after Ms. Terry reported the harassment, and within a six-day period, Mr. Fiquett had issued a directive to Mr. Robinson to keep away from Ms. Terry, interviewed three employees in Ms. Terry's unit, obtained written statements from these three employees, requested and received a detailed statement from Ms. Terry, and moved Ms. Terry to another unit so that she would no longer work under Mr. Robinson's supervision.   It is undisputed that after Mr. Fiquett took these affirmative measures, Ms. Terry did not complain of further sexual harassment by Mr. Robinson.   As to the only two post-transfer acts by Mr. Robinson that Ms. Terry mentioned in her deposition – *i.e.*, a wink and laughter – although she says the acts were sexually harassing, it is undisputed that Ms. Terry did not report them.

Notwithstanding that Mr. Fiquett commenced an investigation promptly after Ms. Terry reported the alleged sexual harassment and that Ms. Terry reported no further sexual harassment, Ms. Terry says that Laurel Oaks did not act reasonably for three reasons.  First, Ms. Terry contends that the investigation was "fairly shallow" and that a more thorough investigation would have shown that Mr. Robinson had sexually harassed her.  (Pl.'s Summ. J. Resp. 20.)  These asserted shortcomings do not create a genuine dispute of material fact.  The reasonableness of the investigation is not controlled by the investigation's ultimate finding of whether sexual harassment occurred or not.  *See Baldwin*, 480 F.3d at 1303–04.  Although Ms. Terry understandably is disappointed with the result of the investigation and that Mr. Robinson did not receive harsher discipline, "corrective action does not always require discipline" of the offending harasser.  *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 654 (10th Cir. 2013).  As explained in *Walton*, "where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow."  347 F.3d at 1288.  Under all the circumstances, it was not unreasonable as a matter of law for Mr. Fiquett to presume that the corrective measures had stopped the alleged sexual harassment after he had removed Ms. Terry from Mr. Robinson's supervision, had warned Mr.

Robinson to stay away from Ms. Terry, and had received no further reports from Ms. Terry of sexual harassment by Mr. Robinson.

Second, Ms. Terry argues that her transfer was "punitive" and "undesirable" because the patients in the acute unit were more "unstable and severe" than those in the DYS unit; therefore, Ms. Terry suggests that Laurel Oaks did not act reasonably to correct the harassment by transferring her to reduce any potential recurrence. (Pl.'s Summ. J. Resp. 20.)  Contrary to Ms. Terry's suggestion, courts have concluded that the victim's transfer can be considered a remedial measure in a hostile work environment claim.  *See, e.g., Ford v. West*, 222 F.3d 767, 779 (10th Cir. 2000) ("Plaintiff's transfer outside the DPW constituted remedial efforts reasonably likely to prevent further harassment by DPW employees."); *Leal v. City of Corpus Christi*, 120 F.3d 266 (5th Cir. 1997) (observing that an employer took remedial action by placing a plaintiff on paid administrative leave and offering the plaintiff a transfer).  So it cannot be that an employer's transfer of the victim-employee, as opposed to the harasser, is a *per se* prohibited method for addressing allegations of sexual harassment.  Although Ms. Terry cites no authority, the court will presume that a materially adverse transfer would be an unreasonable remedial action but that, conversely, a "purely lateral transfer" could qualify as reasonable. *Cf. Shah v. Clark Atlanta Univ., Inc.*, No. 97-CV3786, 1999 WL 1042979, at *8

(N.D. Ga. July 20, 1999) (A "purely lateral transfer . . . if not accompanied by any change in position, title, or salary, and that does not require significant retraining or result in loss of prestige or opportunities for promotion is not an adverse employment action." (citing *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1453 (11th Cir. 1998)); *cf. Doe*, 145 F.3d at 1453 ("Any adversity must be material; it is not enough that a transfer imposes some *de minimis* inconvenience or alteration of responsibilities.").

Although Ms. Terry felt that working in the acute unit was less desirable than working in the DYS unit based upon the type of patients, she submits no evidence or argument that she suffered a reduction in wages or benefits or a change in hours, or that the transfer impaired her prospect for promotional or other advancement opportunities.   Her protest about working with "high-risk" patients in the acute unit is vague and fails to quantify in any meaningful way how her responsibilities, arguably with respect to patient care, were anything other than *de minimis.*  Accordingly, Ms. Terry fails to present evidence establishing a genuine dispute of material fact that Laurel Oaks acted unreasonably in transferring her laterally from the DYS unit to the acute unit as a remedial measure to prevent further sexual harassment by Mr. Robinson.

Third, Ms. Terry argues that Laurel Oaks did not act promptly in remedying the sexual harassment because, notwithstanding that Ms. Terry did not complain about Mr. Robinson's sexual harassment until January 26, 2011, Laurel Oaks should have known at an "earlier stage" about the harassment because it was "open and obvious." (Pl.'s Summ. J. Resp. 20.) Ms. Terry does not cite any authority or provide any further analysis, but for the sake thoroughness, the court will presume that Ms. Terry is arguing that on a date earlier than January 26, Laurel Oaks had either actual or constructive notice of Mr. Robinson's sexual harassment and, thus, acted unreasonably in waiting to address it until Ms. Terry finally reported it. Both theories fail, however.

As to actual notice, the Eleventh Circuit has held that "when an employer's sexual harassment policy clearly specifies the steps an employee should take to alert the employer of sexual harassment, the employer has, by the policy, 'itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures.'" *Madray*, 208 F.3d at 1300 (quoting *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999)). Hence, in *Madray*, the "employer did not have actual notice of sexual harassment because the aggrieved employee brought her complaints 'to individuals not designated by [the employer]

to receive or process sexual harassment complaints.'" *Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 582 (11th Cir. 2007) (quoting *Madray*, 208 F.3d at 1288–89).  Ms. Terry presents no evidence that any individual designated by Laurel Oaks's policy received notice of Mr. Robinson's sexual harassment prior to Ms. Terry's notification to Mr. Fiquett on January 26.  Accordingly, Ms. Terry's actual notice theory fails.

Ms. Terry also cannot rely on constructive notice as a theory for holding Laurel Oaks liable for its supervisor's sexual harassment.  That is because in the Eleventh Circuit, where an employer has published an effective anti-harassment policy with reasonable complaint procedures, that policy "forecloses resort to constructive notice as a means of establishing the notice required for direct liability."  *Id.*  In *Minix*, the Eleventh Circuit explained that in *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 1997), it held

> as a matter of law that "an employer is insulated from liability under Title VII for a hostile environment sexual harassment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternative means of redress."

*Id.*  Based on *Farley* and Ms. Terry having cited no contrary authority, Ms. Terry cannot invoke a constructive notice theory as a basis for holding Laurel Oaks liable for its Title VII supervisor's sexual harassment.   Accordingly, Laurel Oaks has

shown that there is no genuine dispute of material fact that it "exercised reasonable care to . . . correct promptly any sexually harassing behavior." *Faragher*, 524 U.S. at 807. It has demonstrated, therefore, the first element of the *Ellerth*/*Faragher* defense.

### iii. Reasonable Care to Take Advantage of Preventive or Corrective Opportunities or Otherwise Avoid Harm

The second element of the *Ellerth*/*Faragher* defense addresses whether "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807. This requirement "encourage[s] employees to report harassing conduct before it becomes severe or pervasive" and, thus, serves Title VII's deterrent purpose. *Ellerth*, 524 U.S. at 764.

Because this element requires that an employee "comply with the reporting rules and procedures her employer has established," *Baldwin*, 480 F.3d at 1306, an employer's showing that the "plaintiff-employee failed to follow its complaint procedures will often be sufficient to satisfy its burden," *Frederick*, 246 F.3d at 1314. "[A]morphous complaints to persons not authorized to accept complaints constitute[s] evidence that the employee unreasonably failed to take advantage of her employer's complaint procedures." *Id.* (citing *Madray*, 208 F.3d at 1302).

Moreover, in *Walton*, the Eleventh Circuit held as a matter of law that an employee did not exercise reasonable care when she waited nearly three months to report her supervisor's sexual harassment.  *See* 347 F.3d at 1290.  The court rejected the employee's subjective fear of reprisal, stating that such fears "may exist in every case but . . . , standing alone, do not excuse an employee's failure to report a supervisor's harassment."  *Id.* at 1291.  It explained that the employee must demonstrate a "credible threat of retaliation."  *Id.* at 1290.

Ms. Terry contends that she "took advantage of [Laurel Oaks's] policy" when she "made her written complaint of detailed sexual harassment allegations to HR Director Fiquett."  (Pl.'s Summ. J. Resp. 21.)  That may be true, but what Ms. Terry does not address is whether that complaint, which she made on January 26, 2011, and supplemented on February 1, 2011, was prompt.  It was not.  It is undisputed that, prior to January 26, Ms. Terry did not complain of Mr. Robinson's sexual harassment to anyone authorized by Laurel Oaks's anti-harassment policy to receive such complaints.  For more than six months – from July 2010 to January 2011 – Ms. Terry endured the alleged sexual harassment without reporting it to the onsite CEO, Human Resources Manager/Designee, or corporate human resources department, as established by Laurel Oaks's anti-harassment policy.  If a three-month delay in *Walton* was unreasonable as a matter of law, then it logically

follows that the six-month delay here also is unreasonable as a matter of law. *See* 347 F.3d at 1290.

Ms. Terry nonetheless contends that her delay was reasonable because she had developed a general distrust of the human resources department based upon instances where she believed Laurel Oaks fired other employees for "no reason." (Pl.'s Dep. 232.) This general distrust demonstrates, at best, only a subjective and generalized fear of retribution. Ms. Terry does not provide any objective evidence to substantiate her fear of reprisal for reporting harassment. The two instances Ms. Terry cites as having instilled her fear have nothing to do with an employee who was terminated after reporting discrimination to an appropriate company official. (Pl.'s Dep. 232–34.) The court is not unsympathetic to any reluctance Ms. Terry may have had in reporting her superior's sexual harassment, but the Eleventh Circuit has declined to find a delay reasonable on such reluctance "absent a credible threat of retaliation." *Walton*, 347 F.3d at 1290; *see also id.* (holding that the employee's perceived fear of retaliation from her harassing supervisor was not credible where he "never told [the plaintiff] that her job was in jeopardy, nor did he threaten her with physical harm"). As the Eleventh Circuit has put it, "The *Faragher* and *Ellerth* decisions present employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it

to the employer, or lose the opportunity to successfully prosecute a Title VII claim based on the harassment." *Baldwin*, 480 F.3d at 1307.  On the summary judgment record, Ms. Terry lacks evidence of a credible threat of retaliation, and, thus, there is no genuine dispute of material fact that her delay was unreasonable.[22] Accordingly, there is no genuine dispute of material fact that Ms. Terry failed to take advantage of Laurel Oaks's anti-harassment policy and complaint procedures by not promptly notifying Laurel Oaks of Mr. Robinson's alleged sexual harassment.

### iv.   Summary of *Ellerth/Faragher* Defense

In sum, there is no genuine dispute of material fact that Laurel Oaks "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that Ms. Terry "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Laurel Oaks] or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.  Because Laurel Oaks has demonstrated the absence of a genuine dispute of material fact as to each element of the *Ellerth*/*Faragher* affirmative defense and that it is entitled to judgment as a matter

---

[22] To find otherwise on this record would undermine Title VII's policy of encouraging "victims of sexual harassment to come forward because . . . they are often the only ones, besides the perpetrators, who are aware of the sexual harassment." *Adams v. O'Reilly Automotive, Inc.*, 538 F.3d 926, 933 (8th Cir. 2008).  "To excuse a victim from the duty to alert the proper authorities through proper channels specifically discourages the best hope of exposing and eliminating sexual harassment." *Id.*; *see also Ellerth*, 524 U.S. at 764.

of law, summary judgment is due to be entered in Laurel Oaks's favor on Ms. Terry's Title VII sexually hostile work environment claim.

**B.      Title VII:  Retaliation**

Ms. Terry alleges that after she reported Mr. Robinson's sexually harassing behavior on January 26, 2011, Laurel Oaks retaliated against her by terminating her employment on February 10, 2011.  Title VII prohibits an employer from retaliating against an employee for engaging in protected activity.  *See* 42 U.S.C. § 2000e-3(a).  In particular, under Title VII, "[i]t shall be an unlawful practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ." *Id.*

Where the employee presents no direct evidence of unlawful retaliation, as here, he or she must use the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Brown v. Ala. Dep't of Transp*., 597 F.3d 1160, 1181 (11th Cir. 2010).  Under this framework, the employee first must make out a prima facie case of retaliation by showing (1) that he or she engaged in a statutorily protected activity, (2) that he or she suffered an adverse employment action, and (3) that there is a causal relationship between the statutorily protected activity and the adverse employment action.  *Coutu v. Martin*

48

*Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).   Once the employee shows a prima facie case of retaliation, the burden shifts to the defendant "to articulate a legitimate, non-retaliatory reason for the challenged employment action."   *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the employer does so, the employee then must show that the proffered reason is pretextual.   The employee can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning.   *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

For the reasons to follow, although Ms. Terry can establish a prima facie case of retaliation, she cannot satisfy her burden of showing that Laurel Oaks's proffered reason for her termination was a pretext for retaliation.

### 1.   *Prima Facie Case*

As to the first prima facie element, Laurel Oaks does not dispute that Ms. Terry's complaint of sexual harassment on January 26, 2011, which was provided to Mr. Fiquett, is protected activity.   *See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Statutorily protected expression includes internal complaints of sexual harassment to superiors . . . ."). It argues, however,

that the second and third elements are where the prima facie case falters. These arguments fail for the reasons to follow.

Laurel Oaks does not dispute that termination is an adverse employment action, but it points out that Ms. Terry knew that as part of Laurel Oaks's mandatory policy implemented in 2009, she had to sign the employee counseling form to remain employed.[23] Laurel Oaks's position is that Ms. Terry's failure to sign the employee counseling form resulted in a "voluntary separation," not a termination. (Def.'s Summ. J. Mem. 21.) Construing the evidence in the light most favorable to Ms. Terry, however, the court must accept Ms. Terry's deposition testimony that Mr. Ingram and Mr. Fiquett expressly said to her, "You're terminated." (Pl.'s Dep. 292.) Accordingly, Ms. Terry suffered an adverse employment action when Laurel Oaks fired her.

As to third element of the prima facie case, "[w]here there is evidence that the decision maker was aware of the protected conduct, a close temporal proximity between the protected expression and [the] adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case."

---

[23] Ms. Terry does not dispute her awareness of the mandatory policy. She signed two prior counseling forms on the signature line beneath the printed "Mandatory" policy language. (Oct. 2010 Employee Counseling Form (Doc. # 22-5); Jan. 2011 Employee Counseling Form (Doc. # 22-5).) She also reviewed and signed Laurel Oaks's Employee Conduct Policy, indicating that she had received training on the policy, understood it, and agreed to abide by its terms. (Exs. 20 & 22 to Pl.'s Dep. (Doc. # 22-2).)

*Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (citation and internal quotation marks omitted).  The Eleventh Circuit has concluded that a two-month gap between the adverse employment action and the protected expression is sufficient for purposes of the prima facie case.  *See Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829 (11th Cir. 2007) (citing *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000)).

Mr. Ingram and Mr. Fiquett terminated Ms. Terry on February 10, 2011, which was fifteen days after she had complained to Mr. Fiquett about Mr. Robinson's alleged sexual harassment.  On these facts, the fifteen-day span between the protected activity and the termination satisfies the causal link.  Laurel Oaks does not comment on this temporal link, but rather relies on the recent decision in *University of Texas Southwest Medical Center. v. Nassar*, 133 S. Ct. 2517, 2533 (2013), to argue that the "but for" cause of Ms. Terry's termination was her failure to sign the February 10, 2011 counseling form.  (Def.'s Summ. J. Mem. 36–37.)  Although Laurel Oaks correctly states the law as to Ms. Terry's ultimate burden of proof, it cites no authority that *Nassar* changed the analysis with respect to the third element of the *McDonnell-Douglas* prima facie case.  *See Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (explaining that *Nassar*'s "but-for causation" test as to an employee's ultimate burden of proof "does not

alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment . . . indirectly through temporal proximity").  Accordingly, Ms. Terry satisfies her prima facie case.  However, Ms. Terry fails to adduce sufficient evidence from which a reasonable jury could find that Laurel Oaks's proffered non-retaliatory reason for her termination was pretextual.

### 2.   *Legitimate, Non-Retaliatory Reason*

An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a [retaliatory] reason."  *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).  Laurel Oaks says that when Ms. Terry refused to sign the February 10, 2011 employee counseling form, she violated a company policy instituted in 2009.  (Def.'s Summ. J. Mem. 17, 38.)  That policy, as set out in the February 10 counseling form, provides that "[a]s a condition of continued employment with Laurel Oaks Behavioral Health Center, sign below indicating receipt of this notification (signing does not imply agreement, but indicates that the above issue has been addressed with you)."  (Feb. 2011 Counseling Form (Doc. # 22-4); *see also* Pl.'s Dep. 169 (Doc. # 22-1).)  The reason Laurel Oaks proffers for why Ms. Terry's employment ended on February 10 is that Ms. Terry refused to sign the employee counseling form and that pursuant to company policy, her

signature was required as a condition of continued employment.  This reason is legitimate, and it is non-retaliatory.

As to pretext, Ms. Terry offers four arguments, but none prevails.  First, Ms. Terry points to the fact that she received the February 10, 2011 counseling form *after* she had complained of sexual harassment based on an incident that occurred *prior to* her complaint of sexual harassment.  She argues that this "timing issue[ ]" creates a genuine dispute of material fact as to whether her complaint of sexual harassment was the catalyst for the counseling form.  (Pl.'s Summ. J. Resp. 29–30.)  Ms. Terry fails to demonstrate how the "timing issue" shows a weakness or an inconsistency in Laurel Oaks's asserted non-retaliatory reason for Ms. Terry's termination. Significantly, Ms. King and Mr. Ingram submit uncontradicted evidence that during their investigation of the patient-restraint incident, they were unaware of Ms. Terry's sexual harassment complaint.[24]  (*See* Def.'s Summ. J. Mem. 7 (citing Ingram's Dep. & King's Decl.).)  Moreover, as Mr. Terry prefaces her argument (Pl.'s Summ. J. Resp. 29), Laurel Oaks did not terminate her based on the alleged misconduct documented in the February 10 counseling form (on

---

[24]  It is notable also that Ms. Terry does not point to any evidence indicating that any management employee was aware of the January 24 patient-restraint incident that was the subject of the February 10 counseling form until Mr. Hayes reported the incident on January 28, which was two days after Ms. Terry had reported the sexual harassment.

which the timing issue turns), but rather because she violated a company policy that required her to sign the form as a condition of continued employment.

Second, Ms. Terry contends that in September 2009, after Laurel Oaks had implemented the policy requiring an employee's signature on counseling forms, Mr. Robinson failed to sign a disciplinary note issued by Mr. Ingram, yet Mr. Ingram did not terminate Mr. Robinson's employment. (Pl.'s Summ. J. Resp. 30.) It is true that a plaintiff also may show pretext by identifying an employee outside of the protected class who engaged in comparable misconduct but who received preferential treatment, *see Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1276–77 (11th Cir. 2008); however, the 2009 incident involving Mr. Robinson does not fit that bill. For Mr. Robinson to be a sufficient comparator for purposes of the pretext analysis, he must be similarly situated "in all relevant respects" to Ms. Terry, meaning that he "must have been involved in or accused of the same or similar conduct," yet "disciplined in different ways" for that conduct. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

The misconduct of which Ms. Terry was accused is not similar to Mr. Robinson's alleged misconduct. Ms. Terry was accused of failing to intervene in an emergency situation and assist another MHT (Mr. Hayes) in restraining an aggressive patient, a failure that Laurel Oaks believed resulted in Mr. Hayes's

physical injury, while Mr. Robinson was accused of an "unprofessional interaction with a co-worker in the gym" arising from some sort of disagreement between Mr. Robinson and another staff member.   (Memo to File (Ex. 3 to Robinson's Dep.); Ingram's Dep. 63–65; Robinson's Dep. 34–37.)  Ms. Terry's infraction involved an alleged dereliction of duties with respect to patient and staff safety, while Mr. Robinson's misconduct involved a conflict between two employees.   For her misconduct, Ms. Terry received an employee counseling form, which expressly required Ms. Terry's signature as a condition of continued employment pursuant to Laurel Oaks's policy.  Mr. Robinson did not receive an employee counseling form, but rather his alleged bad behavior was documented in a typewritten "Memo to the File" from Mr. Ingram.  In other words, Mr. Robinson did not receive a counseling form that required his signature.  Based upon the dissimilarity in Ms. Terry's and Mr. Robinson's alleged misconduct, it is not for this court to second-guess Laurel Oaks's decision to issue Ms. Terry, but not Mr. Robinson, a counseling form that required a signature as a condition of continued employment.   Ms. Terry's comparison to Mr. Robinson fails.

Third, along the same lines, Ms. Terry points out in another section of her brief that Laurel Oaks's policy requiring an employee's signature on an employee counseling form was revised the year after her termination in April 2011 to remove

the language that "the signing of the counseling form is a condition of continued employment and is mandatory."  (Pl.'s Summ. J. Resp. (citing Dykes's Dep. 37–38).)  The issue is not whether Laurel Oaks's policy conditioning continued employment on the employee's signing a counseling form is a good or bad policy. Courts "do not . . . second-guess the business judgment of employers."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997); *see, e.g.*, *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (concluding that "the fact that the Agreement may have been unnecessary, ineffective or unenforceable would, at most, indicate that [the employer] made a bad business decision," but did not demonstrate that the employer "implemented the Agreement to justify the firing of older women").  Rather, the issue is whether Laurel Oaks's enforcement of its policy that required Ms. Terry to sign the counseling form to keep her job was pretext for a retaliatory motive.  There is no evidence to show that it was.

Fourth and finally, Ms. Terry relies on the "extremely close temporal proximity" between the protected activity and her termination.  (Pl.'s Summ. J. Resp. 29.)  Under Eleventh Circuit authority, however, Ms. Terry cannot rely on close proximity alone to establish pretext.  *See Matias v. Sears Home Improvement Prods., Inc.*, 391 F. App'x 782, 787 (11th Cir. 2010); *see also Jackson v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006) ("Although a plaintiff can use

temporal proximity to show a defendant's proffered reason for termination was pretextual, temporal proximity alone does not establish pretext." (citing *Wascura v. City of S. Miami*, 257 F.3d 1238, 1244–45 (11th Cir. 2001)).  While Ms. Terry's complaint and termination occurred close in time, temporal proximity is all that exists.  Because temporal proximity is all that Ms. Terry has shown, she has not demonstrated that her termination for refusing to sign the counseling form – as required by Laurel Oaks's policy as condition of continued employment – is pretextual.

In sum, the summary judgment facts are sufficient to sustain Ms. Terry's prima facie case on her Title VII retaliation claim.  Laurel Oaks has demonstrated, however, that no genuine dispute of material fact remains as to whether its proffered legitimate, non-retaliatory reason for Ms. Terry's termination is a pretext for retaliation.  Accordingly, Laurel Oaks is entitled to summary judgment on Ms. Terry's Title VII retaliation claim.

## C.   <u>Laurel Oaks's Arbitration Demand</u>

For the first time, Laurel Oaks argues that this action should be stayed and submitted to arbitration pursuant to the arbitration agreement signed by Ms. Terry on March 28, 2006.  Ms. Terry responds that Laurel Oaks waived its right to

arbitration by actively defending this action for so long.   Ms. Terry's position aligns with Eleventh Circuit precedent.

"[A] party may, by its conduct, waive its right to arbitration."   *Garcia v. Wachovia*, 699 F.3d 1273, 1277 (11th Cir. 2002).   "Substantially invoking the litigation machinery" prior to demanding arbitration likely waives a party's right to arbitrate.   *E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 559 F.2d 268, 269 (5th Cir. 1977).   "A party has waived its right to arbitrate if, under the totality of the circumstances, the . . . party has acted inconsistently with the arbitration right, and in so acting, has in some way prejudiced the other party."   *S & H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990) (citation and internal quotation marks omitted).   "When determining whether the other party has been prejudiced, [the court] may consider the length of delay in demanding arbitration and the expense incurred by that party from participating in the litigation process." *Id.*   In *S & H Contractors*, relied upon by Ms. Terry, there was an eight-month delay between the filing of the complaint and the demand for arbitration, and during that eight-month period, the parties litigated two substantive motions and participated in five depositions.   The Eleventh Circuit held that, "as a matter of law, [the non-movant] was prejudiced by [the movant's] delay in demanding arbitration and by its invocation of the litigation process."   *Id.*   The court

concluded that the movant "acted inconsistently with its arbitration right" and, therefore, "ha[d] waived its right to arbitrate." *Id.*

Similarly, in this case, Laurel Oaks did not raise an arbitration defense in its answer or at any time prior to filing its summary judgment motion.  Rather, the arbitration demand comes more than a year after this litigation commenced and follows the close of an extensive, nine-month discovery period that resulted in no less than four depositions, hundreds of pages of documents, and a four-inch summary judgment binder filled with exhibits.  Laurel Oaks fails to distinguish *S & H Contractors*,[25] and the court finds that the factual parallels between *S & H Contractors* and this case mandate the same result in this case as in *S & H Contractors*.  As a matter of law, Laurel Oaks has waived its right to arbitration by substantially invoking the litigation machinery and has prejudiced Ms. Terry by its conduct and delay in demanding arbitration.

**D.   State-Law Claims**

Ms. Terry's remaining claims are state-law claims.  A district court may decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all claims over which it has original jurisdiction.  28 U.S.C.

---

[25] In *S & H Contractors*, it was the plaintiff, rather than the defendant, which demanded arbitration.  No reason has been argued, however, that for purposes of examining the relevant factors, namely, whether Laurel Oaks acted inconsistently with its arbitration right and caused prejudice to Ms. Terry, this distinction makes a material difference.

§ 1367(c)(3). While the decision to exercise supplemental jurisdiction is discretionary, the Eleventh Circuit "ha[s] encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004). In this instance, the court declines to exercise supplemental jurisdiction over the state-law claims. These claims are dismissed without prejudice should Ms. Terry wish to re-file the claims in state court. *See* 28 U.S.C. § 1367(d).

## V.  CONCLUSION

Based on the foregoing, Laurel Oaks is entitled to summary judgment on Ms. Terry's Title VII claims. Summary judgment is appropriate on the Title VII sexually hostile work environment claim based on the *Ellerth*/*Faragher* defense and on the Title VII retaliation claim based on the absence of a triable issue as to pretext. Jurisdiction over the state-law claims is declined. Accordingly, it is ORDERED that Defendant's motion for summary judgment (Doc. # 20) is GRANTED on Plaintiff's Title VII claims alleging a sexually hostile work environment and retaliation. It is further ORDERED that Defendant's motion for summary judgment (Doc. # 20) is DENIED as moot on Plaintiff's state-law claims and that the state-law claims are DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

An appropriate judgment will be entered separately.

DONE this day 28th of February, 2014.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE